Good morning, everybody. And we're ready to proceed with the first matter Ocee v. Attorney General. And I believe the correct name is Ocee. Is that correct? Your Honor, I'll be referring to petitioner as Mr. Frank Benpong. OK, OK, that's fine. The caption says Ocee. Yes, Your Honor. OK. May it please the court, Whitney Hermendorfer for petitioner Frank Benpong, I'd like to reserve three minutes for rebuttal. This court's precedents instruct that an agency may not ignore or understate an asylum applicant's evidence. That rule resolves this case. The agency denied Mr. Benpong asylum on the sole basis that, quote, nothing in the record supported a link between his conceded persecution and his Ashanti tribal membership. But that is wrong. Mr. Benpong repeatedly attributed his persecution to his Ashanti identity through credible testimony and corroborating evidence. There's two possible grounds here. And the immigration judge credited the fact that a landowner could be a protected status under the statute. But that seems to have dropped out an appeal and you're focusing just on tribal membership. Are you still relying upon, because it's really not brief, the land ownership status? Your Honor, our position is that Mr. Benpong's Ashanti tribal membership is the core protected social group at issue, but that it is impossible to separate that from his status as a landowner in this case. And that is why. But he gave an order, I think in 2017, where he requested his sister to sell the land. He's not sure if it was ever sold or not. So the two separate and independent grounds are not as intertwined as you claim, because if the land were sold or were to be sold, the record would suggest that the pure Ashanti status would not be that such as to cause him harm in Ghana. So the land sale dispute goes at most to risk of future persecution. We are focused in this case, Judge McKee, on past persecution. And the nexus question and the reversal we're seeking is narrow with respect to past persecution and whether that has nexus with Ashanti identity. And that is the basis on which the immigration judge engaged in this faulty analysis in which the judge said there was nothing in the record and the record was devoid of any evidence to suggest that Mr. Benpong's Ashanti identity was linked to the land dispute. Are you asking for a reversal or a remand? So we are happy to take our vacater and remand and go back to the agency, Your Honor. But in this case, we believe the record, once it's fairly considered in light of the testimony that the immigration judge ignored and that the board so too ignored, compels reversal because the record is one sided. Mr. Benpong no less than six times said that he was persecuted because of his Ashanti tribal status and an intertribal dispute. He backed that up with corroborating evidence that prolifically links in Ghana tribal, the exercise of tribal dominance over tribal rivals with land rights and land dominance. And so because the Ashanti are the predominant tribe in Ghana by far. I mean, I can't overstate the fact that they are the predominant tribal group in Ghana. So the evidence in this case is that with respect to where Mr. Benpong's land was situated, that the Enzimas were exercising their tribal dominance over him and his uncle prior to him, who the Enzimas murdered based on the undisputed testimony in this case. So but I want to stress, Judge McKeith, to the extent we're even talking about what the evidence shows in this case, the government's already lost because the immigration judge said there was no evidence. It weighed nothing. It gave no consideration to the corroborating evidence, to the points the government has injected into this case, into its brief. And so to the extent the court is weighing or assessing evidence, that is solely with respect to what it should do after it's decided to vacate. Because there's a long line of this court's cases saying when an agency ignores, overlooks, fails to acknowledge evidence that an asylum applicant puts into the record, that is just a per se procedural violation that renders the determination not satisfying substantial evidence. And so at a minimum, this needs to go back to the agency so that the immigration judge or the board can at least give credence to the evidence Mr. Benpong put into the record. So I ask you something, though, because the board, it depends on how we understand the board's affirmance of the IJ. The board said there's no clear error in the immigration judge's finding that this land dispute was fundamentally a personal dispute. So isn't that supported by substantial evidence? No, your honor. The board's analysis was what that one sentence in which it applied a clear error standard to the immigration judge's finding. It then cites a string site of cases for the uncontested proposition that personal disputes do not give rise to asylum claims. No one's contesting that. The question in this case is what is a factual one. What drove the enzimas persecution of Mr. Benpong? And in that score, the board rendered no independent analysis. It said it did not discuss the facts, did not discuss the facts of the cases. It did not apply the cases to the facts. So all we have before us is this clear. And that's not a surprise because the board under the regulations is not permitted to engage in de novo fact finding. So really what is before the court is, OK, well, what was the IJ's, the immigration judge's finding that the board deferred to? And that's, you know, we can quickly cover that because it was three sentences. It said, quote, nothing in the record links Mr. Benpong's harm with his membership in the Ashanti tribe. Quote, the record is devoid of any evidence indicating that the Enzima tribe targeted Mr. Benpong because of his Ashanti membership and thus he has failed to establish protected persecution. So we know at a minimum Mr. Benpong did repeatedly say the reason I was persecuted was because I was Ashanti. And so to separate the two, Ashanti who owned the land. I'm sorry, your honor. We can't separate the two. He was an Ashanti who owned land in a region where the predominant group in that area did not allow for Ashanti ownership of land. That's right, Judge McKee. And that doesn't harm Mr. Benpong's claim. I agree. I agree. Assuming he doesn't own the land, hypothetically, assuming he sold it or his sister sold it, he doesn't, he no longer owns the land. Does that change anything? It does not change anything with respect to the analysis before this court, your honor. Because again, that is that there was, the board did not reach the question of future, well-founded fear of future persecution. It only affirmed the immigration judge's conclusion that the past, it's everyone concedes Mr. Benpong was persecuted to a sufficient degree to give rise to an asylum claim. It's only what drove that past persecution. And so the sale of the land, future harm or lack of harm from the time Mr. Benpong departed to his family, all of those things go to whether he maintains a well-founded fear of future persecution, which is the kind of question that triggers after he's established past persecution under the regulations and on which the burden would shift to the government. So the land sale, the test, just to make one point on the land sale, Mr. Benpong testified at least three times that he did still own the land. So even if we got down that road, there's there's arguments about that. That's why the burden actually matters on that score, your honor, because it would be up to the government to disprove that once he's shown past persecution. Could I ask you, let's say we vacate and on remand, the agency finds that Mr. Benpong was, in fact, persecuted. He gets a rebuttable presumption on the first round. I don't think the government provided rebuttal evidence, but will the government have an opportunity to provide rebuttal evidence on remand or does the record have to stand as it is? On remand, our position will be that this record is closed and that the government has waived any ability to put in additional evidence. What's your authority for that? Doe, your honor, is, we think, on point for this, where it says it's profoundly unfair to allow the government to go through an entire proceeding, not putting at issue, for example, here, credibility, the nature of the persecution with respect to the seriousness. And then to get a second bite at the apple at reopening the record once that goes back down. That was kind of the situation the Doe court said it would not permit. And that is one of the reasons why we asked this court to clarify. We think, if nothing else, clarifying that will be helpful to shape remand moving forward and the scope of the proceedings. But certainly our position on remand will be, the government allowed us to litigate, allowed Mr. Bimpong to go through these whole proceedings, allowed us to litigate this case before this court on the record as it stood. And it would be both unfair and kind of a waste of time, honestly, to have proceeded on these whole, on these bases and then to reopen this and allow them to get another shot. But you mentioned credibility, but he was deemed to be credible by the IJ. So absolutely, absolutely. He was deemed to be credible by the IJ. And the government did not put that into dispute either before the board or before this court. I still go back to Judge Bevis's questions. A question you're asked then is that it be remand, if it's remand, with explicit instruction that the record is closed. We think it would be helpful if your honors think Doe bears on this case to say that and to say how. But the board, there are regulations that govern when the board can seek supplemental briefing, send it back to the immigration judge for further factual findings. We think the record is clear on this score and that the government, there are both forfeiture cases that would apply under the board's precedent that we could seek to impose and argue against the government that it has waived any ability. It did not file a brief in this case before the board. So, yes, we think at this point the board should be examining the record as it stands, including the immigration judges, as Judge McKee pointed out, pro-credibility finding, finding Mr. Bimpong entirely credible. But I don't want to get bogged down in the remand instructions. That's just a secondary issue. Your honor, absolutely, Judge McKee. And that's a secondary issue that we had seen this court's cases and, you know, sometimes engage in that type of dialogue with the agency. And we just thought that would be helpful from both a resource and kind of narrowing the procedure proceeding standpoint. There's evidence that I think he testified that he reported the problems he was having to the local police. I don't think I'm wrong about that. Do you know whether or not the local police are Ashanti? That's not in the record, your honor. What we have about the police and about the government control prong here, which the government has never put at issue, is that, number one, when Mr. Bimpong's uncle was murdered, the evidence and identity of the perpetrators were clear. They were Enzima, but the Enzimas were successfully able to quash the investigation through bribes and their dominance. So, too, when Mr. Bimpong went to the police. That's the problem was through bribes. It wasn't because, well, they took the first position. Well, you know, he's an Ashanti. We're not going to investigate that. It was through bribes. That's a very, I'm not saying that you don't, because they don't have a remand argument, we have a very strong one. But the fact that the bribes in the case really seems to take away the argument you otherwise have that there's a lack of diligence when it comes to protecting the rights of people who are Ashanti in the area. Well, that's not the only incident in which the police declined to get involved, Judge McKee. And if I may, I see I'm out of time, if I may complete my answer to this question. Mr. Bimpong also stated when he went to the police immediately after the 1993 shooting attack on his own life, the police declined to get involved on the basis they, quote, don't interfere in inter-tribal affairs. And then Mr. Bimpong testified live at the hearing that neither the police nor the government were willing to or could provide him adequate protection. OK. It would have been, it's too late now, and your argument is a good one on Doe, but it would have been helpful to know whether or not the local police are Ashanti or Ndima. That would be, I think that would be helpful, even if not dispositive, that would be helpful. OK. And, Judge, I just want to make clear one more time, the government has waived this argument three times over. I understand. Thank you. Thank you very much. Ms. Murcia, you ready? Yeah, you're muted. I'm muted. I apologize, I turned it off during her argument. May it please the Court, Lisa S. Murcia of the Office of Immigration Litigation, for the respondent. Thank you, Your Honors, for letting me appear virtually today for various reasons. The primary issue before the Court today is whether the agency properly denied Mr. Bimpong's application for asylum and withholding of deportation. Mr. Bimpong failed to establish that his alleged persecutors, members of the Ndima, a.k.a. Ahanta tribe, targeted him because of his Ashanti tribal membership, rather than because of a personal dispute over land that he owned that they wished to appropriate for their own use. So wouldn't you admit the BIA's review of the testimony in the record here is shoddy at best? More accurate to say that it's just absolutely lacking. It's not even, doesn't even rise to the level of being shoddy. It just didn't really take a look at what was before it. In terms of the Board's review, the Board's review here was for clearer of the immigration judge's findings. The statement, there's no evidence, I guess that was the IJ statement, that there is no evidence. Well, there is evidence there. There's plenty of evidence, and it has to be credited given his credibility of finding. Well, Your Honor, the immigration judge certainly went through the petitioner's testimony in the beginning, and he also acknowledged all of the evidence that was submitted by the petitioner. To the extent that the petitioner here is arguing that the Board or immigration judge ignored evidence, I mean, it's often been said that the immigration judge or the Board don't necessarily have to write an exegesis. And to the extent that the respondent here, I guess I would say, more expounded on the immigration judge's findings to more detailed respond to the petitioner's pointing to evidence in the record, that doesn't necessarily mean that the immigration judge's findings were in error here. The petitioner keeps pointing to things in the record and saying that this establishes that Ping Pong had established that this was on account of the Shanty Tribal membership. But as we argue in our brief, this is a subjective point of view. He keeps on saying that it's on account of his Shanty Tribal membership. But all of the evidence that he points to points that it wouldn't fulfill the standard, the nexus standard, for establishing that it was on account of his Shanty Tribal membership. Everything points to the fact that it was a land dispute. But Ms. Mercia, those two things are consistent. And what I'm troubled by is it's not that the IJ found him not credible or found his evidence weak. The IJ found that nothing in the record indicates this. The record is devoid of any evidence after finding him credible. What do we make of that? Doesn't that – that's sloppy to treat it as an absence of evidence rather than weighing the evidence against the other evidence. It's also totally inaccurate. If I didn't find him credible, it doesn't say there's no evidence. And there's also language that the court finds the applicant has sufficiently corroborated his claims. It's a dual universe. Well, Your Honor, this is why we cited Ming Dai in the respondent's brief. The idea that a petitioner could be credible and have a subjective point of view, which I think is honestly embodied in this court's decision in Gonzales-Basadas that this court asked us to address in its April 8, 2021, order. The petitioner may certainly think that he's being persecuted on account of, in that case, a particular social group here on tribal membership. But the record might not bear that out. Ming Dai says that he still has to sustain his burden of proof. Well, Zunko was killed. Zunko Onglin was killed. He was shot at. And his credible testimony, which in and of itself we've said can be sufficient to sustain the burden, and here it's corroborated. His testimony is that in that area – and it's corroborated by the country reports – in that area, there's significant not only inter-tribal tension, but that there is sufficient tension to support what he is saying. That the reason he was shot at and his uncle killed was because he is an Ashanti who owned land in an area where Ashantis are not welcome to own land. Maybe a different story in terms of whether an Ashanti could reside there who didn't own land. That might be an interesting academic question, but that's not before us. The problem here is the Ashanti ownership of land in that non-Ashanti area. And the record supports that. I'm sorry. Well, I'm sorry. I didn't mean to interrupt, Your Honor. Your Honor, I would respectfully state that there is a division between the land ownership here, which the petitioner conceded in her brief, or land dispute. The land dispute is not a protected ground. The I.J. found, though, that land ownership – I'm surprised that he found that. I would disagree with it. The I.J. concluded that land ownership was a protected class. So under the I.J.'s rulings, there are two possible grounds here of falling under the statute. One, the Ashanti membership, and two, the status of being a land – of land ownership. And here it's kind of interwoven. It should be suggested that in that area, he's saying – not George Phoebus, but the petitioner – that Ashanti land ownership is not tolerated. Not even not welcome, but not tolerated. And the authorities turn a blind eye toward persecutive behavior to extricate Ashantis from their land. And that's not – Your Honor, I'm sorry. Your Honor, there's no indication that the land ownership issue, which the I.J. simply didn't find that he was a member of that particular social group. No, he did. He did, because he found the petitioner credible. And there's no dispute, I don't think, that the petitioner here is an Ashanti. That's not disputed. Oh, I'm sorry, Your Honor, that he was a land owner. The information judge's decision for finding that the land ownership of a particular social group was not a ground for his claim was that he wasn't a land owner, that he hadn't provided sufficient evidence to that. He said he owned it. Are you going to require a deed? I'm not even sure if there's a recording statute in effect in the Uriangan or where he is. There probably isn't. The court will assume the applicant's claim to be a member of two particular social groups, a member of the Ashanti tribe and land owners. I'm referring to page 8 of the immigration judge's decision, which is the administrative record, page 97. He says that the applicant failed to meet his burden of establishing his membership in a particular social group, in the particular social group of land owners. And this wasn't taken up on appeal to the board. The board never addressed it. The board only addressed the nexus to the tribal membership. What page are you referring to in the appendix? It's, I'm sorry, it's page 97 of the record, page 8 of the immigration judge's decision. Which is also supplemental appendix 13. So earlier on that page is the language that I think really sinks your case where, you know, there's no dispute that Mr. Bimpong's a member of the Ashanti tribe, and the judge leans on nothing in the record indicates the harm he suffered resulted from his membership in the Ashanti tribe. Indeed, the record is devoid of any evidence indicating the Ndema tribe targeted the applicant because of his membership. So you seem to be saying, how is it that if he's targeted because he's Ashanti tribe and owns the land, how can we separate that out? That if he had been an Ndema landowner, he wouldn't have been targeted. The Ashanti is at least one central reason. It's clearly a but-for cause here of why he's being targeted on his account. So if the IJ didn't, is saying things suggesting there's no evidence of this, how in the world can we deny the petition? Well, Your Honor, I think there are two grounds to deny this petition. I believe that you can take the immigration judge's decision simply as a, what we would call a basic motive finding, that there's no evidence in the record. However, the board also affirmed it on the basis that there was one that, you know, looking at the record and the immigration judge's findings for clear error, that it was no one central reason, even if you considered Ashanti membership about that. And I do want to address the petitioner's point that there's evidence in the record. As we pointed out in our brief, they point out this one article about Ashanti. I'm sorry, not about Ashanti tribal membership, but simply tribal membership in Ghana. But there's no evidence in the record that there's any historic rivalry in between the Ashantis and the Nzema tribe. Why does it have to be historic? Well, because, Your Honor, the petitioner is basing their argument on the assumption that the Nzemas are targeting him because of his Ashanti tribal membership. But when you look at the evidence that's displayed in the record, he only cites the land dispute. He doesn't cite his tribal membership again and again in his testimony. If Your Honors, if I could just give one or two examples. For example, when he's being questioned, here he was posthased and he's being questioned by the immigration judge. And I'm referring to page 53 of the transcript, which is page 169 of the administrative record. The judge asks him, like, why would you fear, what do you think would happen to you if you returned to Ghana? And he says, I think I would be killed. The immigration judge asks, you would be killed by whom? Who will kill you? And he says Ashanti tribe. But when the judge asks him why, he says, I sold the land, even though I am the one who owns the land now. I'm the one who got the documents from the land. Another example. It's his being Ashanti owning the land, right? So the land is a but-for cause, but so is his being Ashanti. Those two things fit together here. But Your Honor, I think as we as we point out in our brief, it's admittedly if you stop at but-for cause, then that would be it. But this court's case law, you know, as stated in Gonzalez-Cruzada's, as stated in Nishiyama, it doesn't stop there. It says it has to be but-for and it has more than minor. It has to be more than it has to be not incidental or tangential. But-for, that's the same thing. If it's but-for, it's significant. It's more than minor. But the argument you're making may win the day, but at least I can't be assured that the IJ or the BIA ever considered it, given its statement that there is no evidence in the record to support it. There clearly is. Well, Your Honor, I think, again, the question under the substantial evidence standard of review is does this evidence compel? And as we break down in our brief, each point of evidence that the petitioner tries to cite to can be read either way. She cites, I'm sorry, he cites an article about tribal membership, but that doesn't mention anything about the Ashanti tribe's rivalry within Zima tribe. Again and again in his testimony, he only cites the land dispute as a reason that he was targeted. When he-for example, on page 184, when he says he went to the police, he said they were going to-they told me they were going to do an investigation because no specific person to arrest at the moment. I was a target because of the land, they told me. That's what he states to the immigration judge. Again and again, he cites the land dispute, not his Ashanti tribal membership. And also- What I'm thinking is that the land dispute by itself may not have gotten him in trouble. It was the fact that he was an Ashanti who owned the land in that region that caused the problem. So it's not really fair to separate them out like that. And the IJ didn't separate them out. I'm sorry, Your Honor, but if I could also point out something else that we pointed in our brief. He testifies that at one point, he sells land to an Nzema tribe member. But that Nzema tribe member is also targeted by the Nzema people, the other members of the Nzema tribe who want the land. He specifically testifies that a person who is not an Ashanti tribal member, who owns the land that these other members of the Nzema tribe wish to appropriate, that that person is also driven off the land by the members of the Nzema tribe who want that land. Again, the BIA could make that analysis, could factor that into its deliberation and conclude that he hasn't sustained his burden. But that's very different from saying there is no evidence, which at least makes me conclude that the IJ and the BIA didn't really consider the record and the testimony that they said was credible. The argument you're making is a sound argument. But it would be helpful if the IJ had considered that or the BIA considered it. Your Honor, in that circumstance, my response would simply be that the substantial evidence standard is whether the record compels reversal here. Well, when there's evidence in the record that would support his claim, and the IJ and the BIA say there's absolutely no evidence to support his claim, why wouldn't that compel a remand? Both of them can't be true. Well, again, under the substantial evidence standard, the standard simply is whether it would compel a contrary conclusion. That's if there's no procedural error. But there appears to be a procedural error here. Your Honor, the Petitioner, I respectfully state this, but I don't believe that there was ever a due process argument that was ever raised either before the Board or here saying that there was an agency procedural error here. What we're arguing about here is truly substantial evidence. I would like to clarify that when you're making an argument that the immigration judge ignored or didn't consider evidence, that's essentially a procedural due process argument that had to be exhausted before the Board in the first instance. At this point, we're arguing about the substantial evidence standard and whether or not the record compels reversal. And on this record, the record does not compel reversal. And my apologies, I think I'm over time at this point. That's okay. Anything else? Thank you very much. Thank you, Your Honors. Ms. Herndorfer, I hope I'm pronouncing that correctly. You deserve some time. Sometimes attorneys will just stand on their argument in the breeze. Sometimes they'll do that. This will be brief. It won't be brief. It will never be brief. I promise, because this last point we were discussing is actually critically important to Chenery and separation of powers. The government says that the substantial evidence test does not account for procedural errors. That's just wrong. This court in Doe, Lucingo, Shavaria, Espinosa-Cortez, Liang, over and over again, when there is a failure to acknowledge evidence in the record, that is a separate procedural basis for a vacater. And that's important because the court cannot be second-guessing or gap-filling faulty agency analysis, both because it disincentivizes a type of analysis that is amenable to judicial review, and also because it involves the court stepping in and filling the role of the policymaker that's been delegated the power by Congress. So this is a separate and independent ground for vacater, even if the court has different views about how the evidence is going to cash out on remand in this case. So we'll rest on our briefs for the other points with respect to why the government is wrong, its arguments are wrong on their own terms. Thank you, Your Honor. That was quasi-brief. I can't help but observe. Oh, I do want to thank you. Thanks. Ms. Rumendorf, you're pro bono, and I very much want to thank you for undertaking the representation here. We couldn't really do our job without the dedicated voluntary efforts of folks like you who agreed to take on cases pro bono. So thank you very much. I didn't look up. I should have. Are you with a firm? Williams & Connolly, Your Honor. Okay, well, please, you're with a firm. That's a significant firm. So please give the thanks to the court, to the folks at the firm, whoever it is there who pulls those strings and agrees to that representation. Please pass on our thanks for them. Thank you, Your Honor. Thank you very much, and good luck with everything. I also can't help but remark this is the first time in 27 years on this Court that I've presided over an argument where there have been more female attorneys arguing than male attorneys. I noticed that last night when I was going through the minutes of the counsel, that there are more female attorneys today than male attorneys. So maybe something's right. There's even one, another girl. Yeah. Is it a girl? Another girl. Okay, all right, okay. I must say she didn't say anything that I objected to. Well, you are. Okay, well, good luck with everything. Thank you. And I can't help but recognize the presence once again of Miss Ianna Rosen, a very dedicated member of the Third Circuit who's gracing us with her attendance here today.